IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

George C. Clark,                          :
                    Plaintiff             :        Civil Action 2:11-cv-108

            v.                            :        Judge Economus

Michael J. Astrue,                        :        Magistrate Judge Abel
Commissioner of Social Security,
                    Defendant             :

## REPORT AND RECOMMENDATION

Plaintiff, George C. Clark, brings this action under 42 U.S.C. §§405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security denying

his applications for Social Security Disability and Supplemental Security Income bene-

fits. This matter is before the Magistrate Judge for a report and recommendation on the

administrative record and the parties' merits briefs.

### Summary of Issues.

Plaintiff Clark maintains that he became disabled at age 54 bypost traumatic

stress syndrome and leg problems. (*Page ID# 199.*) The administrative law judge found

that Clark could perform his previous work as a groundskeeper, janitor and assembler.

(*Page ID# 77.*)

Plaintiff argues that the decision of the Commissioner denying benefits should be

reversed because:

- The administrative law judge erred when he found that Clark's bilateral knee
  chondromalacia was not a severe impairment.

- The administrative law judge erroneously evaluated Clark's mental impair-

ment and failed to discuss the VA treatment after May 2007.

- The evidence supports that Clark meets Listing § 12.03.

**Procedural History.**  Plaintiff filed his applications for disability insurance bene-
fits and supplemental security income on December 11, 2006, alleging that he became
disabled on December 31, 2005, at age 54.  (*Page ID*## 164-66, 167-71.)  The applications
were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing
before an administrative law judge.   On November 20, 2009, an administrative law
judge held a hearing at which plaintiff, represented by counsel, appeared and testified.
(*Page ID*## 86-106.)  A vocational expert also testified.  (*Page ID*## 106-13.)  On January
22, 2010, the administrative law judge issued a decision finding that Clark was not
disabled within the meaning of the Act.  (*Page ID*## 66-78.)  On December 11, 2010, the
Appeals Council denied plaintiff's request for review and adopted the administrative
law judge's decision as the final decision of the Commissioner of Social Security.  (*Page
ID*## 54-58.)

**Age, Education, and Work Experience.**  Clark was born June 20, 1952.  (*Page ID*#
194.)  He has an equivalent high school education, earning a GED.  (*Page ID*# 204.)
Clark previously worked as a forklift driver, groundskeeper, janitor and assembler,
machine operator and truck driver.  (*Page ID*# 200.)

**Plaintiff's Testimony.**  The administrative law judge fairly summarized Clark's
statements and hearing testimony as follows:

> The claimant lives independently in subsidized housing.  He re-

ported to his psychiatric Consultative Examiner (CE) that he goes to bed at 11:00 p.m., gets up at 9:00 a.m., takes naps, eats three meals per day, has a drivers' license and drives. He indicated that he has no hobbies, stays at home, watches some television, , and prepares his own meals. He performs the grocery shopping, laundry, cleaning and money management, although he has complained of being nervous interacting with clerks in stores (Exhibit 13F/4, but see Exhibit 11F/30). [ ] The claimant reported to his CE that he has panic attacks approximately once a week over the past two years, with symptoms of sweats, hyperventilation, tachycardia (Exhibit 13F/3). He does not appear to have reported these to his counselor or psychiatrist (See Exhibits 1F, 5F, 11F, 12F, 15F, 16F). He notes difficulty being around crowds, or in stores, and "apparently exhibits agoraphobia" (Exhibit 13F/3). In an Adult Function Report completed by the claimant and his case manager, the claimant indicated that he could shop in stores, and regularly went to church, the library, step meetings, and "Our place" drop in center where her helped with peer counseling. He did note fear of public places and strangers, but appears to have been able to function in the listed situations without difficulty. Although he testified to occasional volunteer counseling on a part time basis, and said he regularly left the center when he felt uncomfortable, no behavioral problems or anxiety symptoms related to his volunteer work have been described in any of his medical or psychological treatment appointments. The record shows that he actually volunteered "at least 5 days a week" at the drop-in center, had to be "forced" to take a weekend off to recuperate from a cold, and "keeps so busy he doesn't let his mind get him in trouble" (Exhibit 11F/19, 22, 36). He reports participating in varied social events including going on a date, going to the zoo, going to a Cleveland Browns football game, and hiking with friends (Exhibit 11F/15, 16, 22). He also reported that he might go on a mission trip to Africa (Exhibit 11F/39). [ ] The claimant demonstrates sufficient concentration, persistence and pace to drive a car, act as treasurer for his area Narcotics Anonymous group, provide peer counseling and telephone intervention at least 5 days a week at the drop-in center next to his subsidized apartment, and attend "courses and conferences on mental illness" including Peer Support Training, although he prefers to attend in a group (Exhibits 11F/30 and 5F/7). [ ] The claimant and his case manager stated in his Adult Function Report that he has no difficulty paying attention, is able to finish what he starts, handles changes in routine "fine", and can follow spoken and written instructions "excellently" (Exhibit 5E/10-11). He aspires to get an associate's degree, and believes he can obtain financial aide, since his previous student loan debt was voided after the loan company's default. His hobby is playing com-

puter games on his Playstation.

(*Page ID*## 70-71.)

**Medical Evidence of Record.** The relevant medical evidence of record is summarized as follows:

**Mental Impairments.**

Veteran Administration ("VA").  Plaintiff was initially evaluated by a psychiatric physician assistant, Kishwery Fiaz at the VA on January 5, 2007.  (*Page ID*## 340-43.) Plaintiff reported a history of mood problems since he was molested at age 7, with a knife at his throat, from which he still had nightmares.  Plaintiff sometimes misperceived action and behaviors of others, acted impulsively, became violent easily, and went into rage episodes.  Plaintiff reported difficulty sleeping, due to racing thoughts; he felt uncomfortable in public places, and sometimes escaped into the woods.  Plaintiff also reported that he came from a very dysfunctional family in which his father had died when he was 15 years old; his mother was a chronic alcoholic and decreased; his fiancé had died of cancer and two older adopted brothers were also deceased.  Plaintiff stated that "who ever had loved me, has died." (*Page ID*# 340.)  He had a history of past treatment for crack cocaine and alcohol, but had been clean about 2 and one half years. While in the military, plaintiff reported that he had seen smoke from a power plant, which took the form of a face, and believed he saw the face of God at that time; he also believed he had traveled back in time 25 years earlier, when he was found 400 miles from his residence.  It was noted he drank "2 pots/12-15 cups of coffee every day."  He

4

left the Air Force in 1979 because he couldn't get along with others, and was fearful that if he stayed longer, his discharge would not have been honorable. His mood was depressed, and affect was blunted/restricted/constricted; it was unclear whether he was having paranoid delusion, and his judgment was impulsive. He was diagnosed with bipolar and depressive disorders. Plaintiff was assigned a Global Assessment of Functioning ("GAF") of 48.

Plaintiff was seen by Robert Sterne, Ph.D., a VA psychologist, on February 20, 2007. During this evaluation, plaintiff reported that he had substantial trouble in the military taking orders, and accepted an honorable discharge when it was offered. He noted his fiancé died of a heart attack. He reported difficulties being around people, trusting people, and felt vulnerable in public; he had been that way most of his life. He had become very upset in Kroger, when he heard the sound of someone opening a knife, and felt threatened; he described week long cycles of depression twice a month, especially with holidays, and also reported highs with increased energy, decreased need for sleep, and racing thoughts. He heard vague, non-specific voices for about a year, but could not make out what was being said; he rated his depression as 8/10; it had gotten better since starting medication. Plaintiff reported sleep problems with nightmares, which were related to when he was molested as a child. Plaintiff also related to Dr. Sterne that he felt bad for all the people he has harmed by selling them cocaine as he knows that by doing so, he made some of them homeless. Dr. Sterne diagnosed bipolar disorder type I with psychotic feature and PTSD (childhood, non-

military).  Plaintiff was assigned a GAF of 50.  Dr. Sterne concluded that since plaintiff was already engaged in mental health services, no further services appeared to be needed.  (*Page ID*## 440-42.)

In March 2007, plaintiff began receiving psychotherapy and assistance from social workers at the VA.  Plaintiff noted that he had been sleeping through the night.  (*Page ID*# 387.) He reported that he was the secretary of his local Narcotics Anonymous ("NA") meeting.  (*Page ID*# 385.) Physician assistant Sherry Martin ("PA Martin") noted that plaintiff's sleep improved with medications, although his nightmares had returned and he thought other shelter residents were calling his name while he was sleeping.  (*Page ID*# 383.)

In May 2007, plaintiff reported to his social worker that he felt a little depressed around Mother's Day and his deceased brother's birthday, but that he had "not experienced the deep slip he has had before and he has had only one nightmare," crediting the involvement of his mentors and supporters.  (*Page ID*## 380-81.) PA Martin noted normal speech and thought processes, a full affect, and good concentration and memory, and she adjusted plaintiff's medications.  (*Page ID*# 382.)

Dr. Sterne noted in May 2007, that plaintiff was alert, oriented, and cooperative; his speech was normal, and his thought process was coherent, relevant and goal directed.  His memory and reality testing was intact, with no indication of hallucinations.  His mood was mildly dysphoric.  He reported some difficulty in maintaining sleep.  Dr. Sterne continued plaintiff's diagnoses of Bipolar Disorder Type I, with psychotic feat-

ures, and Post Traumatic Stress Disorder (Childhood, non-military).  (*Page ID*## 378-79.)

On November 13, 2007, plaintiff reported to Dr. Sterne, that he felt more anxiety than usual, found it increasingly hard to meet people in public, and took his case worker with him for appointments.  Plaintiff also reported that he was able to sleep some nights, but had nightmares on other nights with racing thoughts that made it hard to sleep; he had memory problems taking that interfered with his medication on time. He experienced increased anxiety, became nervous interacting with others, including store clerks, with an overwhelming sense of doom, and needed to escape.  He had a lifetime of isolating, and thinking other people would hurt him; he described himself as a "wallflower," which made him feel safe.  (*Page ID*## 425-26.)

In March 2008, plaintiff reported that he had less depression and survivor's guilt, and also reported improved sleep, increased motivation, and more stable moods.  (*Page ID*## 416-19.) His "family" from NA had been taking him out for coffee and took him hiking for a day.  (*Page ID*# 418.)  Dr. Sterne noted that plaintiff was drug free, living independently, doing volunteer work and had more stable moods.  (*Page ID*## 418-19.) On March 5, 2008, plaintiff reported that he was taking his medication as prescribed, but later admitted that he had not been medication compliant when PA Martin confronted him with evidence of pharmacy mailings and serum Depakote levels that showed this to be untrue.  (*Page ID*# 416.) PA Martin did not make any medication changes because plaintiff was beginning to feel better due to his support system.  *Id.*

Plaintiff reported he was "feeling much better with improved sleep (getting over physical illness he says), good appetite, and improving motivation. He is active in his support activities for others." *Id.* PA Martin urged plaintiff to take his medication as prescribed and to be more forthright regarding his actual medication regimen so that they could better monitor his psychiatric illness. *Id.*

In May 2008, plaintiff reported to Dr. Sterne that he felt threatened being around crowds, and became aggressive, going into a self-preservation mode. He reported several incidents with the potential for violence, in which he became verbally aggress-ive, but not violent. Plaintiff also reported less depression, but continued to evidence an unstable mood. (*Page ID*## 412-13.) Plaintiff did however report that he was less depressed and had less survivor's guilt. *Id.*

Plaintiff first saw psychologist, Rebecca Fox, Ph.D., at the VA on June 25, 2008. He reported that was skipping Seroquel doses every other day out of fear of becoming addicted, and that he had nightmares on the days when he skipped his Seroquel dose. He indicated that he continued to volunteer at NA, where he was a sponsor. He reported that he had been sober for 19 months. He noted that he enjoyed his life in spite of his symptoms, noting that he had gone on a date and to the zoo. (*Page ID*## 410-11.) When seen by Dr. Fox on July 9, 2008, he reported visual hallucinations which he was able to manage, but auditory hallucinations had all but disappeared; he did report experiencing tactile hallucinations in which he felt someone or something was sitting on his bed, and touched his shoulder, which he believed was a spirit. (*Page ID*# 407-08.)

He was doing well when he seen by PA Martin in July through October 2008.  (*Page ID#* 405-07, 471-72.) In July 2008, he told PA Martin that he had decreased moti-vation and mood and that he was sleeping more.  However, Dr. Fox noted that he "seem[ed] to be managing very well and living a fulfilling life" and assessed his bipolar disorder as "stabilized." (*Page ID*## 408-09.)

In February 2009, PA Martin noted that she had not seen plaintiff since October 2008.  Plaintiff reported that things were stressful, and he was having nightmares concerning deceased family members.  Plaintiff also reported four friends had died in the past 45 days, two by drug overdose, and two by suicide.  His community volunteer-ing was also stressful as services had been reduced due to lack of funding.  He was still volunteering 3 days/week and noted increased caffeine intake, 10-12 cups of coffee on those days, which interfered with taking his sleep medications.  His speech was slightly hyperverbal, but his affect was full, concentration and memory were good, and his thought process and content were normal.  PA Martin adjusted his medications. (*Page ID*## 468-69.)

Plaintiff reported on May 5, 2009, that he dislocated his right shoulder.  He was dreaming that he was fighting when he took a swing with the right hand, injuring him-self.  Plaintiff also reported experiencing additional stress related to his NA leadership position as he was having to relocate.  Plaintiff noted his depressive episodes usually lasted up to a week in which he withdrew from others with low motivation, decreased appetite and low mood.  It was noted that he was compliant with his medication.  He

was having a good day, but affect was still blunted. (*Page ID## 464-65.*) In September 2009, plaintiff reported to PA Martin that he was still having problems with his mood, but he was "still busy during the day and g[ot] plenty of phone calls." (*Page ID## 481.*)

Plaintiff saw psychiatrist, Sheridan Smith, M.D., for his scheduled medication management appointment on September 30, 2009. Dr. Smith noted that plaintiff was alert and cooperative who was oriented in all spheres and had fair grooming and hygiene. Plaintiff's speech was normal in rate, rhythm and tone. Thought content was appropriate to topics discussed and thought processes unremarkable. His affect was appropriate. His mood was slightly subdued. There was no evidence of depression, anxiety, mania, formal thought disorder, cognitive impairment. His thinking was logical, goal directed and future oriented. Insight was fair. Judgment, reasoning, concentration intact. Plaintiff reported that his current psychotropic medicines are effective and denied that they have caused him any side effects. (*Page ID## 479-80.*)

New Horizons/Arthur Thalassinos, M.D. Plaintiff was evaluated by psychiatrist, Dr. Thalassinos, on January 10, 2007. Plaintiff reported whomever had loved him had died. He had been a loner most of his life. Plaintiff also reported that he had been molested in a movie theater when he was a teenager, two brothers had died, a girlfriend had a heart attack, and he had grown up in a quite dysfunctional family, with an alcoholic mother. He reported he had stopped crack cocaine two years earlier, was in recovery, and a active member of NA. He hardly slept, had frequent nightmares, and woke up with increased heart rate, night sweats, and dyspnea. His mood was depress-

ed, appetite was increased, and concentration was poor, he felt hopeless at times with intermittent suicidal ideation, and was not in control of his life. He had a bad temper from which he went into rages when he felt someone had wronged him. He had infrequent occurrences of hearing someone call his name; his mood was dysthymic, and affect restricted. Dr. Thalassinos diagnosed post-traumatic stress disorder, depressive disorder-not otherwise specified; polysubstance and cocaine dependence, both in remission. Plaintiff was given a prescription for Lexapro to be filled at the Chillicothe VA. (*Page ID## 356-57.*)

 <u>Becky Longnecker/Lutheran Social Services.</u> In January 2007, Ms. Longnecker, plaintiff's case worker at Lutheran Social Services helped plaintiff complete an Adult Function Report in which she indicated that plaintiff led NA meetings, sponsored NA members, provided peer support, and did these things "well." She also noted that plaintiff had "no problem paying attention," followed written and spoken instructions "excellently," and currently got along "very well" with authority figures. (*Page ID##* 248-55.)

 Ms. Longnecker, wrote a letter to the SSA in June 2007, stating that she had been working with plaintiff since November 20, 2006, when he became a client at the Fairfield County Emergency Shelter. She has assisted plaintiff with linking with various resources in the community, including applying for Social Security. Ms. Longnecker further reported that plaintiff had requested her presence at appointments with other agencies numerous times. Due to his anxiety, plaintiff is unable to meet with other

professionals on his own. He becomes increasingly nervous which leads to confusion and inability to concentrate for extended periods of time. He becomes overwhelmed very easily which lends to increase symptoms of anxiety and depression. (*Page ID*# 392.)

Ms. Longnecker wrote another letter in October 2009, where she reported that plaintiff had frequent nightmares including the one when he threw himself out of bed; he became anxious when faced with appointments and/or paperwork, and also became depressed from which he, spent time alone in his apartment. He was very active in treatment, followed through on appointments, and made good use of his support system to request assistance when needed. (*Page ID*# 488.)

<u>Marc E. W. Miller, Ph.D.</u> Plaintiff underwent a psychological evaluation by Dr. Miller, a state agency psychologist in August 2009. Plaintiff reported that he attended NA seven days a week, drove, stayed at home, prepared his own meals, took care of his own cooking, laundry, and cleaning; and shopped at the grocery. His longest work had been for one year; he had been fired from multiple jobs due to conflict with co-workers and supervisors. He attempted to commit suicide in 2003 and in 2004 and currently had suicidal thoughts at times. He reported that he had no support system, although he does have one friend. He also reported that he had panic attacks approximately once a week over the past two years, with symptoms of sweats, hyperventilation, and tachycardia. He noted that he lacked social skills, and had never learned to interact appropriately with others.

During the mental status examination, Dr. Miller observed plaintiff was depress-

ed, restless, impulsive, and quite animated; attention span and concentration were impaired; he exhibited hand tremors, body jerks, and was fidgety. Dr. Miller diagnosed a schizoaffective disorder bipolar type, panic disorder with agoraphobia, and polysubstance abuse, primarily cocaine, in remission. Plaintiff was assigned a GAF of 50. Dr. Miller found plaintiff's concentration was fair to poor, noting plaintiff's allegations that he had difficulty keeping his mind on task or reading. Dr. Miller opined that plaintiff was not impaired in his ability to understand, remember and carry out routine job instructions; moderately impaired in his ability to persist in task completion; and markedly impaired in his abilities to interact with co-workers, supervisors and the public, to maintain attention and concentration, and deal with stress and pressure. (*Page ID##* 447-54.)

Karen Stailey-Steiger, Ph.D./Mel Zwissler, Ph.D. In February 2007, state agency reviewing psychologist, Dr. Stailey-Steiger, concluded that plaintiff's condition was severe but would improve with continued treatment and positive life-style activities and indicated that his impairments therefore were not expected to last the twelve months required to establish disability. (*Page ID##* 358-72.) In July 2007, state agency psychologist, Dr. Zwissler reviewed the updated record and affirmed Dr. Stailey-Steiger's assessment. (*Page ID#* 389.)

**Physical Impairment.**

VA Medical Center. Bilateral x-rays taken of plaintiff's knees in December 2006 were normal. (*Page ID#* 277.)

In July 2007, plaintiff underwent an orthopedic evaluation by Dr. Kiani for complaints of pain in both knees that plaintiff had reported had been present for almost one-and-a-half years.  Examination revealed no swelling in the knee joints and no restriction in movements, as plaintiff had full extension and almost 130 degrees of flexion in the knee joint.  His collateral ligaments were stable in both knee joints and tests were negative for any cruciate ligament instability.  McMurray's test produced some discomfort bilaterally, and grind tests were positive for chondromalacia of knee-caps in both knees.  Plaintiff was diagnosed with chondromalacia in both knees.  An MRI of the knees was ordered to rule out any internal derangement of the menisci.  (*Page ID#* 433.)

In October 2008, general practitioner, Dr. Gonela examined plaintiff in follow up.  Plaintiff had normal musculoskeletal examination, with no knee joint swelling.  Dr. Gonela advised plaintiff to take brisk 30-minute walks daily.  (*Page ID#* 399.) In March 2009, plaintiff did not have any new musculoskeletal complaints, and his musculo-skeletal examination was normal.  (*Page ID##* 466-67.) In September 2009, plaintiff complained of "off and on" pain in his knees.  He had not been taking his osteoarthritis medication, but requested the medication since it had been helpful in the past.  Plaintiff had normal musculoskeletal examination, including normal findings in the knee joints.  (*Page ID#* 482.)

<u>Thomas Vogel, M.D.</u>  In July 2007, state agency physician, Dr. Vogel reviewed the record and opined that plaintiff's physical impairments were not severe.  (*Page ID#*

14

390.)

**Administrative Law Judge's Findings.** The administrative law judge found that:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since December 31, 2005, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairment: schizoaffective disorder (20 CFR 404.1520(c) and 416.920 (c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is able to understand, remember and carry out simple tasks and instructions; maintain attention and concentration for two hour segments over an eight hour work day; able to respond appropriately to supervisors and co-workers where contact with others is casual and infrequent; and able to adapt to simple change and avoid hazards in a work setting without strict production standards.

6. The claimant is capable of performing past relevant work as a [groundskeeper, janitor and assembler]. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2005 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(*Page ID*## 68-78.)

**Standard of Review**. Under the provisions of 42 U.S.C. §405(g), "[t]he findings

of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."' *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla."' *Id*. *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight."' *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.** Clark argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge erred when he found that Clark's bilateral knee chondromalacia was not a severe impairment. Plaintiff alleges that since the VA awarded a 10% Non-Service Connected Disability Pension with a rating of 10% for each knee and based on his complaints of constant knee pain, he claims that he is limited to sedentary work. According to plaintiff, the administrative law judge's finding that his knee impairment was not "severe" is not

supported by the record as whole.

- The administrative law judge erroneously evaluated Clark's mental impairment and failed to discuss the VA treatment after May 2007. Plaintiff contends that the administrative law judge improperly evaluated plaintiff's alleged mental impairment in which the VA awarded a 70% disability rating. Plaintiff argues that his disorder was treated extensively at the VA by psychiatrist, psychologist, and various therapist from January 2007 through at least September 2009. According to plaintiff, consultive examiner, Dr. Miller opined that plaintiff suffered from marked limitations in social functioning and concentration, persistence, or pace which met Listing 12.03. Plaintiff further contends that the reports of the treating VA sources were consistent with these conclusions, along with the observations of Ms. Longnecker.

**Analysis.**

**Plaintiff's Additional Evidence**

Plaintiff submitted additional evidence to the Appeals Council when he requested review of the administrative law judge's decision: Department of Veterans Affairs award dated September 22, 2007 of a non-service-connected pension; VA treatment records from 2007; and medical records from March and April 2010. (*Page ID*## 311-32, 489-96.) Where, as in plaintiff's case, the Appeals Council had denied review of the administrative law judge's decision, that decision constitutes the final decision of the Commissioner subject to review. A district court cannot consider new

evidence which the claimant has submitted only to the Appeals Council unless the Appeals Council has granted review. Plaintiff's additional evidence was not, therefore, part of the record on which the Commissioner's final decision was based, and, consequently, it is not considered to be part of the administrative record for the purpose of judicial review. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *see also Casey v. Secretary of Health & Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1993); *Wyatt v. Secretary of Health & Human Services*, 974 F.2d 680, 685 (6th Cir. 1992). Consequently, only evidence of record before the administrative law judge may be considered by the District Court in reviewing the final decision of the Commissioner of Social Security denying benefits. *Cline v. Comm'r. of Social Security*, 96 F.3d 146, 148-49 (6th Cir. 1996).

The United States Court of Appeals for the Sixth Circuit has held that evidence submitted in the first instance to the Appeals Council or the District Court may only be considered in determining whether remand is appropriate pursuant to sentence six of §405(g). *Casey*, 987 F.2d at 1233; *see Cotton*, 2 F.3d 692; *see also Wyatt*, 974 F.2d at 685. An outright reversal of the administrative law judge's decision cannot be based on evidence which was not available at the administrative hearing.

A sentence six remand is warranted only upon a showing that the evidence is new, material, and that there is good cause for failure to incorporate the evidence into the record at the administrative hearing. *Casey*, 987 F.2d at 1233; *see Wyatt*, 974 F.2d at 685. A sentence six remand is not warranted in this case. The Court notes that

plaintiff did not raise this issue in his Statement of Specific Errors or bother to reply to the Commissioner's Memorandum in Opposition[1]. Plaintiff has, therefore, waived that claim of error. *Cf., Heston v. Commissioner of Social Security,* 245 F.3d 528 (6thCir. 2001). Clark has not established and, indeed, has not even addressed-these two prerequisites to a sentence six remand for the consideration of new evidence.

If the Appeals Council has denied review, the court must ignore the new evidence. However, the court left open one option for claimants: if the claimant has demonstrated good cause justifying a remand based upon the new evidence, the court may remand the case for consideration of that new evidence. *Cotton,* 2 F .3d at 696, (6th Cir. 1993); *Cline v. Commissioner of Social Sec.,* 96 F.3d 146, 148, (6th Cir. 1996). However, plaintiff repeatedly cited to the above evidence in his statement of errors without requesting a remand. This Court lacks authority to consider the evidence and to make a determination as to disability based upon that evidence. The appropriate remedy [for the consideration of new evidence after the administrative law judge's decision] is a new application. *Smith v. Comm'r of Soc. Sec.,* No. 1:07cv199, 2008 WL 2311561, at *6 (S.D. Ohio June 4, 2008)(Barrett, J.)(citing *Sizemore v. Sec'y of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir. 1988).

---

[1]However, in accordance with case law in this Circuit, this Court will not consider new allegations of error first introduced via a reply brief. *See, e.g., Wright v. Holbrook,* 794 F.2d 1152, 1156 (6th Cir. 1986); *Boothe v. Comm'r of Soc. Sec.,* No. 1:06-CV-00784, 2008 WL 281621, at *8 n.1 (S.D. Ohio Jan. 31, 2008) (Spiegel, J.).

### Knee Impairment

As noted, the administrative law judge found at step two of his sequential analysis that plaintiff suffers from no physical severe impairment.  Plaintiff argues that the administrative law judge should have found his chondromalacia of his knees was a severe impairment that limited him at most to sedentary work.  Specifically, he contends that based on his diagnoses of chondromalacia from Dr. Kiani in June 2007 and his VA disability pension award, he should have been limited to sedentary work.

A claimant fails at step two if he does not demonstrate an "impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c).  Stated in the reverse, an applicant should be rejected at step two only if the alleged impairment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985) (citation omitted).

While, the "severe" impairment threshold of step two is a "*de minimis* hurdle . . . , Congress has approved the threshold dismissal of claims obviously lacking medical merit, because in such cases the medical evidence demonstrates no reason to consider age, education, and experience" at steps four and five.  *Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988) (citation omitted).  This severity threshold "increases the efficiency and

reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).

On substantial evidence review, the court cannot conclude that plaintiff has met his burden of proving an "impairment or combination of impairments which *significantly* limits his physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (emphasis added). In summarizing the record as to plaintiff's alleged physical impairment, the administrative law judge found:

> The claimant alleges chronic knee pain. X-rays in December 2006 were normal bilaterally. In July 2007, he presented at orthopedic clinic complaining of pain laterally on the right knee and both medially and laterally in the left knee that had been present for almost a year and a half duration. Examination of the knee joints revealed there was no swelling in the knee joints. Movements were not restricted. He had full extension and almost 130 degrees of flexion in the knee joint. His collateral ligaments were stable in both knee joints. Lachman's test and posterior drawer test were negative for any cruciate ligament instability. MacMurray's test produced some discomfort laterally in the right knee and medially and laterally in the left knee. Grind tests were positive for chondromalacia of kneecaps in both knees. The claimant was diagnosed with mild chondromalacia in both knees. Magnetic Resonance Imaging (MRI) of the knees was ordered to rule out any internal derangement of the menisci, but the results of this test have not been submitted in evidence. It is noted that a two page gap occurs in the VA documentation submitted by the claimant's attorney, which jumps from page 30 to page 33. In October 2008, the claimant's doctor noted that he had a diagnosis of osteoarthritis of the knees, but had normal knee joints with no swelling on examination. It was recommended that he take brisk 30 minute walks daily. The claimant's gait has consistently been observed to be normal, and he uses no ambulatory aids.

(*Page ID*## 69-70, citation to record omitted.) After reviewing the evidence related to plaintiff's knee pain complaints, the administrative law judge found that the objective evidence does not support a finding that it significantly limits the claimant's ability to ambulate effectively, the claimant's knee arthralgia/osteomalacia impairment is considered not severe.  (*Page ID*# 70.)  Based on the record in front of the administrative law judge at the time of his decision, substantial evidence supports the administrative law judge's finding that plaintiff's knee problem is not a severe impairment.  Plaintiff has not presented evidence to overcome the administrative law judge's findings.

### Listing 12.03

Plaintiff next argues that his mental impairment meets Listing § 12.03 based on the record as a whole, including: the VA determined he was permanently totally disabled as a result of a combination of his physical and mental impairments; Dr. Miller found plaintiff was markedly limited in social functioning and concentration, persistence, or pace; and the observations of plaintiff's caseworker, Ms. Longnecker,  established that plaintiff had difficulties in a quasai work setting.

The VA disability award is discussed above and the Court will not revisit that issue.  The administrative law judge gave "partial weight" to Dr. Miller's assessment finding that his opinion was "based entirely on the single clinical interview and mental status examination [of] the claimant, with no reference to the claimant's medical records." (*Page ID*# 76.)  The administrative law judge also found it was "based on the claimant's subjective and significantly edited description of his symptoms, treatment

and activities." (*Page ID* # 77.)  The administrative law judge found that during the consultative examination, plaintiff "made no reference at all to the volunteer work that appears from other medical evidence to be the focal point of his activity.  He reported that for daily activity he stays at home, watches TV, and performs household tasks.  He also alleged panic attacks three times weekly which were not reported in any other medical evidence." (*Page ID* # 76.)  The administrative law judge further found that plaintiff's statements to Dr. Miller were inconsistent with the rest of the record, i.e. plaintiff told Dr. Miller that he had difficulty concentrating, "that he had only one friend, no support system, avoids others, and stays at home." (*Page ID* ## 75, 77, 447, 449-50.)

Turning to Ms. Longnecker, plaintiff's case manager, plaintiff contends that her observations are consistent with the treating and examining sources.  According to Ms. Longnecker, when plaintiff became depressed, he needed to spend time alone in his apartment, he became very anxious when faced with appointments and/or paperwork, had sleep difficulties with frequent nightmares including the incident when he injured himself during a nightmare.  Ms. Longnecker, cited to no examination findings in support of her opinions, *see Page ID* ## 392, 488, a proper consideration under the Regulations.  *See* 20 C.F.R. § 404.1527 (d)(3) (the better an explanation a source provides for an opinion, particularly objective medical findings, the more weight the administrative law judge will give to that opinion).

In addition, Ms. Longnecker's letters are internally inconsistent with the Adult

Function Report she completed in January 2007, in which she indicated that plaintiff led NA meetings, sponsored NA members, provided peer support, and did these things "well." She also noted that plaintiff had "no problem paying attention," followed written and spoken instructions "excellently," and currently got along "very well" with authority figures. (*Page ID*## 248-55.)

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.** It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v.*

*Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

 s/Mark R. Abel
United States Magistrate Judge